HINES, Director General of Railroads, v. MILLS. (No. 2209.)

(Court of Civil Appeals of Texas. Texarkana. Feb. 12, 1920. Rehearing Denied Feb. 19, 1920.)

1. APPEARANCE ⊜⇒20—CITATION WAIVED BY ANSWERING GENERALLY.

By filing a general answer defendant waived the issuance and service of citation and voluntarily submitted himself to the jurisdiction of the court, and was bound by any judgment thereafter rendered.

2. TRIAL ⊜⇒194(19) — REQUESTED INSTRUCTION IN ACTION FOR INJURIES TO RAILROAD FIREMEN PROPERLY REFUSED AS ON WEIGHT OF EVIDENCE.

In an action for death of a fireman killed by reason of a derailing switch being left open, the court properly refused, as being on the weight of the evidence, a request to instruct "that, if you believe the engine was caused to leave the track on account of defects in the derailing appliances, and those defects were caused by the repair man having taken some pipes, rods, and connections out temporarily to repair them, and said repairs were necessary to maintain the appliance in proper condition, and they were to be kept out only a short time, then you cannot find that such act was an act of negligence."

3. TRIAL ⊜⇒352(4)—REQUEST TO SUBMIT INQUIRY AS WHETHER FIREMAN SAW THE DANGER OF RUNNING INTO OPEN DERAILMENT SWITCH PROPERLY REFUSED FOR WANT OF EVIDENCE.

In an action under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for the death of a fireman in a derailment caused by an open derail switch, the court properly refused to submit to the jury the inquiry, "Do you find from the evidence that deceased, situated as he was, either saw or should have seen the derail open in time to have, by the exercise of ordinary care, requested the engineer to stop the train, or so lessened its speed that the engine would not have been derailed, or the tank would not have been overturned, and the said M. would not have been killed?" there being no evidence that the open switch could have been seen in time to have stopped the train.

4. DEATH ⊜⇒86(2), 88, 89—MEASURE OF DAMAGES TO WIDOW AND CHILDREN STATED.

The damages to a widow and children for wrongful death are limited to the pecuniary benefits, if any, which the widow and children respectively have lost, and in fixing the amount due the minor children, the money value of the loss of the care, training, and education which the deceased would have bestowed on them if he had lived should be considered, but no damages should be allowed the widow for loss of care, consolation, training, and guidance, or for grief or loss of companionship or society.

5. DEATH ⊜⇒99(4)—$40,000 TO WIDOW AND CHILDREN OF RAILROAD FIREMAN NOT EXCESSIVE.

$40,000 to the widow and five minor children of a railroad fireman 38 years old, of good habits, who was earning $185 per month, spent mainly for their benefit, held not excessive.

Appeal from District Court, Gregg County; Chas. L. Brachfield, Judge.

Action by Mrs. Vergie Mills, administratrix, against Walker D. Hines, Director General of Railroads. Judgment for plaintiff, and defendant appeals. Affirmed.

Geo. Thompson, of Ft. Worth, and R. S. Shapard, of Dallas, F. H. Prendergast, of Marshall, and Young & Stinchcomb, of Longview, for appellant.

W. C. Shoults, of Longview, and Johnson & Edwards, of Tyler, for appellee.

HODGES, J. In May, 1918, while in the employ of the Texas & Pacific Railway Company, H. C. Mills, a fireman, was killed by

the derailment of an engine and tender at a crossing over the Kansas City Southern Railway near the city of Texarkana. An interlocking plant had been installed and was maintained at that crossing. It was so constructed that a derail switch and the proper signals were operated by a man in the tower. The mechanism was such that this man could not lower the signal boards until he had first operated the lever designed to close the derail switch so as to make it safe for trains to pass over. In the daytime the engine men relied exclusively upon the signal boards to indicate whether the switch was open or closed; there being no other device to convey that information. Those signals were given with lights at night. At the time Mills lost his life the train on which he was employed approached that crossing at its schedule speed of about 40 miles an hour. The engineer gave timely notice of his approach by blowing the whistle. Thereupon the tower man moved the lever which should have closed the derail switch so to make it safe for the train to pass over, and at once lowered both signal boards, indicating to the engineer that the track and crossing were safe. The train proceeded at full speed. When it reached the derail switch the locomotive and tender were derailed, and the engine turned over, causing the death of Mills. It was discovered afterwards that an employé in the railway service named Pollock, the foreman in charge of the interlocking plant, had been working upon the derail switch the day before the accident, and had disconnected its appliances so that it could not be closed from the tower, and left it in that condition at the time of the accident. He had not notified the tower man of that condition, nor had he flagged the train or given any other signal to indicate that the derail switch was open. The switch being disconnected from the appliance by which it was operated, the tower man was able to and did lower the signal boards without automatically closing the switch. He was misled by that fact and failed to give any other signal regarding the condition of the switch. Pollock, the foreman, did not testify, and no reason is given for his failure to take some precautions to guard against accidents of that character. The appellee, Mrs. Mills, qualified as administratrix of the estate of her deceased husband, and brought this suit under the federal Employers' Liability Act to recover damages in behalf of herself and her five minor children. She filed her suit on November 6, 1918, against Pearl Wight, as the receiver of the Texas & Pacific Railway Company. On the same day citation was issued and served on the local agent of the receiver. On November 18, 1918, the first day of the term of court following the institution of the suit, Pearl Wight filed his petition and bond for the removal of the case to the United States District Court for the Eastern District of Texas. The application for removal was overruled. On December 11, 1918, Pearl Wight moved the court to dismiss him from the suit, and asked that W. G. McAdoo, Director General of Railroads, be made the defendant. On December 12th following the court heard and sustained that motion and entered an order dismissing Pearl Wight as defendant and directing that W. G. McAdoo, Director General of Railroads, be substituted; and thereupon the case was continued for the term, according to the record, at the instance of the defendant. On May 5, 1919, the opening day of the May term of that year, Mrs. Mills filed her first amended original petition, in which she alleged substantially the same facts embraced in her original petition, but substituted Walker D. Hines, then the Director General of Railroads, as the defendant in the suit in lieu of Pearl Wight, receiver. The case was called for trial on the 15th of that month; whereupon F. H. Prendergast and Ras Young, attorneys who had previously represented the receiver, appeared in court as amicus curiæ and suggested that there had been no citation issued to Walker D. Hines, Director General of Railroads, and none served upon him or any agent of his; that this defendant had not then appeared in court; and that the trial could not proceed without such service. After hearing the discussion the court ruled that the Director General was in court under the service theretofore issued and served upon the local agent of the receiver. Thereupon the above-mentioned attorneys filed a general answer for the Director General, as they say, under protest. Without further objection the trial proceeded, resulting in a judgment against the appellant in the aggregate sum of $40,000, which was apportioned as follows: To Mrs. Vergie Mills, the wife, $10,000; to Bertha Mills, $3,061.20; to Birdie Mills, $4,285.70; to Ruby Mills, $5,510.20; to Clay Mills, $7,959.20; to James Mills, $9,183.70. The case was submitted on special issues, in deciding which the jury found that the defendant's employé Pollock just before the derailment left the derail switch disconnected so that the signal boards would and did lower when operated by the tower man without the switch being lined up with the main track; that this was negligence; that such negligence was the proximate cause of the derailment of the train and the death of Mills; that the deceased was not guilty of contributory negligence; that the amount required to fairly and reasonably compensate the surviving widow and children of the deceased for the pecuniary damages which they had sustained was as above stated.

[1] The first error assigned applies to the ruling of the court in requiring the Director

General to go to trial at the time the case was called because he had not previously been served with a citation nor had any been served upon a representative of his requiring him to answer the plaintiff's amended original petition. The record shows that the Director General through his attorneys filed a general answer, and upon the issues thus presented the case was tried. If the service upon the local agent in the suit against the receiver was legally insufficient to put the Director General in court and within its jurisdiction, the Director General was not then compelled to appear and answer in the case. A judgment rendered against him without an appearance would have been void. By filing an answer he waived the issuance and service of another citation and voluntarily submitted himself to the jurisdiction of the court, even assuming that the previous citation issued and served was not sufficient service upon him. It is therefore immaterial whether the service in the first instance may have been insufficient or not. Having answered generally, he was in court for all purposes and was bound by any judgment thereafter rendered. If for any reason he was not prepared to go into the trial of the case at that time, he should have applied for a continuance or postponement in order that he might make the necessary preparations, and the error, if any, on the part of the court in then proceeding to trial would have been in refusing to grant that application. No such application was made, and no ruling of that kind is here complained of. The assignment is overruled.

The appellant requested the following charge:

"That if you believe the engine was caused to leave the track on account of defects in the derailing appliances, and those defects were caused by the repair man having taken some pipes, rods, and connections out temporarily to repair them, and said repairs were necessary to maintain the appliances in proper condition, and they were to be kept out only a short time, then you cannot find that such act was an act of negligence."

[2] Such an instruction would have been on the weight of the evidence. Assuming that rods and connections had been taken out temporarily for the purpose of making necessary repairs, that did not relieve the employés in charge of that department of the service of the duty of taking some precautions to prevent a derailment such as occurred in this instance. The tower man testified substantially as follows:

"I was the tower man at the interlocking plant, working for the Texas & Pacific Railway, and it was my duty to operate the plant. When the train in question got to the derail switch near the crossing of the Texas & Pacific and the Kansas City Southern Railway, the engine was derailed because the derail switch was not lined up with the main track. Mr. Pol-

lock, signal foreman working for the Texas & Pacific Railway, had been working on the appliances of the derail switch the day before the accident, and had the same disconnected so that it could not be operated with the lever in the tower. He was working on the derail switch again the day of the accident, and up to the time thereof. He must have had the switch appliances disconnected by leaving out the signal lock, without which I could not operate the switch with the lever. Just after the accident he told me that he had the signal lock out. It was bound to be out, or I could not have possibly lowered the boards with the lever in the tower without first closing the derail switch. With the derail appliances so disconnected the lever in the tower would operate just the same as it would if, with the appliances connected, it lined up the switch with the main track. It was Pollock's duty to keep the interlocking device and the derail switch and its appliances in repair and in proper working order."

[3] The third assigned error complains of the refusal of the court to submit an issue which we regard as immaterial. The court also refused to submit the following inquiry to the jury at the request of appellant:

"Do you find from the evidence that H. C. Mills, situated as he was, either saw or should have seen the derail open in time to have, by the exercise of ordinary care, requested the engineer to stop the train, and that the engineer could have either stopped the train or so lessened its speed that the engine would not have been derailed or the tank would not have been overturned and the said H. C. Mills would not have been killed? You will answer this question 'Yes' or 'No.'"

The following is the proposition explaining the purpose of that assignment:

"In a case where a suit is brought against the operator of a railroad under the master's liability acts passed by Congress for the death of an employé the question of assumed risk is a proper one to be submitted to the jury if there is evidence sustaining it, and under such circumstances it is error for the court to refuse to submit the question of assumed risk to the jury."

There was no evidence that warranted the submission of that issue. The engineer testified substantially as follows:

"I was the engineer and H. C. Mills was the fireman operating the locomotive at the time of the derailment. The engine was derailed because the derailer of the interlocking plant was open; it had been left open by the signal and derail crew. We did not learn that it was open until we got near enough to see it, which was too late to stop the engine so as to avoid the derailment. We had not noticed that repairs were being made; there was no order to run slow; no flag was out to notify us that the derailer was open. I saw that the derail switch was open when we got to a point 125 to 150 feet from the same, and after the derailment I saw that the switch was disconnected from the connecting rods on the interlocker. When I discovered that the derail was open the engine was moving at a speed of about 40

miles an hour. It was impossible then to stop the engine before reaching the switch and running off the same; this was impossible because the intervening distance was too short, considering the speed of the train. The deceased as fireman was engaged in the discharge of his duties at the time of the derailment. I know that he observed the derail switch and saw that it was open before the locomotive reached it, because he spoke to me about it; this was after I had already discovered that the switch was open and had commenced applying all available means of stopping the train. The deceased had nothing to do with stopping or slowing down the engine, except to ask me to do so. I was operating the engine and had already discovered the position of the switch before Mills spoke of it, and, I think, before he discovered it. As soon as I saw the open position of the switch I shut off the throttle, applied the brakes in emergency, and reversed the engine."

C. L. Lad, testifying for defendant, stated that he was with witness Schepp when observation was made from a slowly moving engine to observe how far the open position of the derail switch could be seen, and found this distance to be 501 feet; that in his opinion an engine pulling five or six cars on a level track and going at speed of 40 miles an hour could be stopped within 550 or 600 feet. The court gave the following charge on contributory negligence at the instance of defendant:

"You are instructed that, if you find from the evidence in this case that a person of ordinary care, situated as the deceased, H. C. Mills, was in approaching the derail, would have seen the derail in such time that he could have, in the exercise of ordinary care, requested the engineer to stop the train, and that the engineer could thereafter have, by the use of the means at hand, either stopped the train before it reached the derail, or reduced its speed to the extent that the tender would not have overturned, and the said H. C. Mills would not have been killed, then you will consider that the said H. C. Mills was guilty of contributory negligence, and the amount of damages, if any, sustained by the plaintiff by reason of his death should be reduced in such a proportion as the negligence, if any, of the said H. C. Mills bears to the entire negligence."

There was no error in refusing the requested charge. The appellant requested several special charges on the measure of damages, which were refused.

[4] In charging upon the measure of damages the court gave the following instructions:

"For your guidance in answering this, the fifth question, you are further instructed that neither the widow nor any child of the deceased can recover any damages or compensation for grief resulting from his death, nor for mere loss of his companionship or society, nor for solace or consolation. The damages, if any, recoverable by the widow and children of the deceased or either of them in this case are by the law limited and confined to the pecuniary benefits, if any, which said widow and children, respectively, have lost by reason of the death of said H. C. Mills. By 'pecuniary benefits' is meant contributions of money and other benefits which may be reasonably valued in money, if any shown by the evidence, which the widow and children of the deceased would have received from him if he had not been killed, and which they have lost by reason of his death."

The court charged at the instance of the defendant:

"If you find for the plaintiff, in fixing the amount you allow to Mrs. Mills as her portion you will not allow her anything for the loss of the care, consolation, training, and guidance her husband would have bestowed on her if he had lived."

The court further charged at the instance of defendant:

"If you find for the plaintiff; in fixing the amount due the minor children you may consider the money value of the loss of the care, training, and education which you find from the evidence the deceased would have bestowed on them if he had lived. You must fix the amount at such sum as is supported by the evidence that has been introduced. You cannot fix the amount to be allowed from your experience as men, but must find such amount as the evidence will support."

[5] No complaint is made of the court's main charge quoted above. We think those instructions correctly and sufficiently informed the jury concerning the law applicable to the measure of damages. It is contended that the verdict is excessive. The evidence shows that the deceased was 38 years of age at the time of his death, and had a life expectancy of approximately 29 years. He was earning about $185 per month, with a prospect of promotion to a position that would pay, under some circumstances, $250 a month. He was a man of good habits, devoted to his family, and spent his income mainly for their benefit. He left his wife and five children, the oldest a girl 15 years of age, and the youngest a boy 5 years of age. They were all living with and being supported by Mills. While the allowance is a liberal one, we cannot say it is more than should have been awarded. The argument is made that $40,000 loaned at 8 per cent. interest would annually yield a return greater than the entire income Mills was receiving at the time of his death, or had any prospect of receiving by virtue of future promotion. That is true; and, if the income lost by the death of Mills furnished the sole measure of the damages which his wife and children should recover in this suit, the argument would have much force. While there can be no recovery in cases of this character for the mere loss of companionship or for the mental anguish suffered by the wife and children on account

of the death of the husband and father, there may be a recovery for the value of the services which the deceased might and would have rendered in training and educating his children. It is always difficult to estimate in money the value of such services. The law has intrusted that duty to the juries, and this court does not feel warranted in disturbing an estimate which does not plainly appear to be exorbitant. But the rule applied 'in the argument above referred to' is not, for a different reason, a safe guide. It is by no means certain that the amount recovered in this judgment can be kept constantly loaned so as to yield 8 per cent. in interest annually and upon a security which involves no risk of loss of any part of the principal. Assuming that 8 per cent. is the usual commercial rate of interest at which money is loaned, we cannot overlook the fact that such loans involve more or less of a hazard which sometimes causes the loss of all or a part of the principal loaned. Investments which are considered absolutely safe yield a much lower rate of interest than 8 per cent. per annum. In another assignment appellant complains of the language used by one of the attorneys of the appellees in·his closing argument to the jury. We have examined the language complained of, and do not find it subject to the .objection made. The. remaining assignments of error, which have not been discussed, have been considered, and are overruled.

The judgment will be affirmed.