## EL PASO ELECTRIC CO. v. PERKINS et al.*
### (No. 1965.)

Court of Civil Appeals of Texas.  El Paso.
March 3, 1927.

Rehearing Denied March 24, 1927.

1. **Appeal and error ⊕999(3)—Jury finding that electrician, killed by electric charge, was not guilty of contributory negligence, held final.**

In action by wife and children of one killed by electric charge, finding of jury that deceased was not guilty of contributory negligence *held* conclusive.

2. **Electricity ⊕19(12)—Independent contractor's employee, killed while grounding wire without using rope nor heeding warning, held not contributorily negligent as matter of law.**

Where electrician, employed by firm doing construction work for defendant, killed by electric charge while grounding wire, was shown to have made every test to assure himself that the line was dead and had every reason to so believe, *held*, that he was not guilty of · contributory negligence as matter of law in not using rope in passing chain over wire and in failing to heed warning that discharge from ground pipe on another part of line was unusually heavy.

3. **Electricity ⊕18(1)—Causal connection between negligent closing of switch and death of independent contractor's electrician held not broken by his omission of precautions.**

Fact that electrician employed by independent contractor, killed by electric charge while grounding wire, failed to use usual precautions though he had received warning, *held* not to have broken causal connection between the negligent closing of switch on the line and his death.

4. **Death ⊕99(4)—$30,000 for death of electrical engineer held not excessive.**

In action for wrongful death by wife and children of highly trained and experienced electrical engineer, age 32, in good health, and earning $260 per month, $30,000 *held* not excessive.

5. **Appeal and error ⊕1060(1)—Asking jurors, in action for wrongful death, if they carried compensation insurance, if error, held harmless.**

For court to permit plaintiff's counsel, in action for wrongful death in examining jurors on their voir dire, to ask whether they carried compensation insurance, if error, *held* harmless.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Suit by Willie Odom Perkins and others against the El Paso Electric Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, of Houston, and Goggin, Hunter & Brown, of El Paso, for appellant.

Lea, McGrady, Thomason & Edwards, of El Paso, for appellees.

HIGGINS, J.  This is a suit by appellees, the surviving wife and children of Bailey Perkins, deceased, against appellant, to recover damages under the death by wrongful act statute. The defendant answered by general denial, plea of contributory negligence alleged in general terms, and a special plea with respect to insurance carried by Stone & Webster under the Workmen's Compensation Act. No point is presented here with respect to this plea requiring any statement of its nature. The defendant owns and operates an electric light and power plant in the city of El Paso. The deceased was an employee of Stone & Webster and the relation of master and servant did not exist between appellant and deceased. The case was submitted upon special·issues, all of which were found in favor of plaintiffs, except No. 4, requested by defendant, which was evidentiary upon the issue of contributory negligence. It was answered in the affirmative and reads:

"Prior to attempting to pull any ground chain over feeder 101 on the switch tower, was Perkins advised or warned that any of the lines of said feeder 101 was probably charged or carrying current?"

The warning to which the issue refers was given by the witness Murrill, and is later discussed.

[1] It is insisted by appellant the deceased was guilty of contributory negligence as a matter of law. As to this issue the case is purely one of fact upon which the finding of the jury is final. The facts are peculiar to this case and none of the cases cited by either of the parties have any direct application.

The defendant's main plant was located in the southwestern portion of the city of El Paso, and about a mile or so easterly·and slightly north was what the defendant designated as its Dallas Street substation. Two sets of high power lines known as "feeders" consisting of three separate 13,000 volt wires each extended from the company's main plant to and beyond the Dallas Street substation. The set called "high line No. 101" passed by the substation a short distance to the north, and the set designated as "high line No. 103" passed by the substation a short distance to the south. Prior to the date of Perkins' death

---

⊕For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error refused May 18, 1927.

No. 103 had been connected with the substation, and on that morning the line department of the defendant was going to, and did, connect No. 101 with the substation.

Both sets of feeders, that is Nos. 101 and 103, passed from the defendant's dynamos through an outside switching tower immediately adjoining the main plant on its south wall. This tower consisted of a series of platforms and metal superstructure which contained heavy oil switches and manual disconnects. The oil switches were not operated by hand directly, but were controlled by switch handles on the main switchboard inside the plant some 60 feet or so away from the heavy oil switches themselves. When the switch handle on the control board was pulled open a green pilot light appeared under it as indicating the circuit was open, and when the switch handle was closed a red light appeared as evidence that the circuit was alive. The manual disconnects above referred to were in addition to the heavy oil switches and were manipulated by taking a disconnecting hook in the hand and physically pulling out the disconnects, thereby creating a gap in the circuit.

About a mile east of the Dallas Street substation high lines Nos. 101 and 103 could be connected together by means of a switch, called by the defendant "switch No. 21." The substation was a relatively small affair situated at the corner of Dallas and Olive streets, the latter extending east and west along the north side of the substation, and the former extending north and south along the east side of the substation. High lines 101 and 103 were on top of 40-foot poles and were strung above all other lines in the city so that no other line of any sort could fall across them. On the top of the first pole beyond Dallas street east from the substation on 101 line was "switch No. 8," a device weighing about 250 pounds operated by means of a handle about halfway up the pole attached to a rotating iron pipe, somewhat after the fashion of a railroad switch. The handle could be locked shut or locked open, and controlled all three wires of the set as a unit. The oil switches at the plant also operated as a unit; that is, when the control lever was pulled open all three wires of the set were disconnected, and when the control lever was shut all three wires were in contact.

The defendant could and did use either or both sets 101 and 103 at the same time according to its convenience and the amount of current required. If the oil switches and disconnects were open at the main plant, and pole top switch No. 8 was open, that would "kill" or de-energize all of that section of high line 101 between the defendant's dynamos and switch 8. If defendant was not using line 101 out of the plant, but was using line 103 out of the plant, and closed switch No. 21, but opened switch No. 8, this would allow the current to flow out of the dynamo through line 103 to switch 21, then into line 101, and back toward the plant through that line as far as switch No. 8.

The events leading up to Perkins' death, as shown by the evidence, will be reviewed in order to show the high degree of security which Perkins must have felt for his own safety before he went to work on 101 line at the plant that morning. Perkins was an employee of Stone & Webster, who were doing construction work for the El Paso Electric Company, and it was understood between Perkins and the defendant's line department that Perkins would do his work on the line at the plant while they had the line dead for the purpose of making the connection at the Dallas Street substation. The work at Dallas street was under supervision of C. S. Murrell; Ralph E. Jump being foreman of the squad actually doing the work. George Blessing, in Jump's squad, closed switch 21, which tied together high lines 101 and 103 east of Dallas street. After that they came back west to switch 8 on 101 line, where Joe Watson, another squad member, in the presence of Blessing, Jump, and others, opened this switch. Then Jump, the foreman, went to a telephone, called up the power plant, and told the employee who answered the call that switch 8 was open, with the request that 101 line be opened at the plant and for them to be sure the disconnects were out. Jump held the phone until he got the report from the plant that the line was open there.

The man at the plant who took Jump's message was Richard V. Griggs, defendant's switchboard operator, who went off duty at 7:45 a. m. Prior to that time he had received Jump's statement that he had 101 line feeding through 103 through switch 21 and that switch 8 was open. Griggs pulled the control on the switchboard which opened the oil switch and went to the outside switching tower and there pulled out all of the manual disconnects of 101 high line. He then went back to the telephone and told Jump, who was still holding it, that 101 was clear, oil switch open, and disconnects out. Griggs then placed on the control switch at the board a danger tag with Jump's name on it, showing the line was tagged to Jump.

Knowing through Griggs that the line was open at the plant, Jump then went back to the substation and had George Blessing put a ground chain across 101 line one pole southwesterly of the pole directly in front of the substation; that is, between the substation and the power plant. This probably occurred around 7:45 a. m., or between 7:45 and 8 o'clock. The chain was attached to an iron pipe driven into the earth and the other end pulled over the wires. However, no water was poured on the pipe at the time of the attempted grounding, and according to W. B. Hold, one of Jump's squad men, it was not until 20 or 30 minutes or so later that

water was used to make a better connection. If the line had been properly grounded it would have taken off any deadly current which might have gotten onto it and made it safe to work on under the conditions existing on the morning of Perkins' death. At this stage of the proceedings Jump's squad of men went to work on 101 line between the ground chain and switch No. 8. This conclusively demonstrates the fact that at that time 101 line was not energized west of switch 8, the power plant side of the switch.

Bailey Perkins arrived at the power plant shortly prior to 7:45 a. m. and was first noticed by Lonnie Bowen, the defendant's operating engineer, at about the hour mentioned when he (Perkins) was up on the control board tagging 101 line out. Roberts was the operator of the board then, having just replaced Griggs. Bowen heard Roberts give Jump's message to Perkins, and then Perkins called Roberts' attention that Jump's tag was on the line, and Perkins' tag was on the line, and Perkins told Roberts not to let the line department energize the line until he (Perkins) had O. K.'d his tag. Meanwhile C. S. Murrell, who had been out at the Dallas Street substation to start the men off to work there, came in to the plant and prior to the time when Perkins went to work on 101 line told him (Perkins) that the line was open and grounded.

[2] In the presence of Engineer Bowen, Perkins tested his line three times to be sure it was dead. It checked out dead. This was true to the knowledge of two electrical experts, for Bowen himself was checking the line with Perkins. During the last two tests his helper, Butler, was also present and vouches for the fact that, immediately prior to the time when Perkins went to work on the line, it did not give any indication even of static. On the evidence of both Bowen and Butler, Perkins went directly from this test to put a chain over the line, and while so doing, met his death from a charge of electricity coming from 103 line onto 101 line through switch No. 8 which had become closed on account of defendant's negligence, said current further passing by the attempted ground near the Dallas Street substation, which would have taken the current off had it been properly grounded.

Appellant insists that, because Perkins got upon the metal superstructure and did not first attach his chain to a ground and then pull it over 101 line with a rope, he was guilty of contributory negligence as a matter of law. Had he performed the grounding operation in that way, he would not have been killed. The evidence is undisputed that such is the only safe way to ground a live high power line. But, in view of all the evidence and the precautions taken by Perkins to assure himself that the wire was not a live wire, we cannot say that he was guilty of contributory negligence as a matter of law in attempting to ground the wire in the way he did.

Perkins would have been perhaps justified in going to work on 101 line with his bare hands without undertaking to put on any ground chain at all. That is what Jump's squad of men at the Dallas Street substation did do, and they did it with the approval of both Jump, their immediate boss, and C. S. Murrell, the defendant's assistant general line foreman. Furthermore, there was no reason apparent to defendant's operating engineer, Bowen, why Perkins should not have done anything he wanted to with the line. Bowen was satisfied it was all right and went on back into the plant.

Just before he undertook to ground the wire Murrell told Perkins there seemed to be an unusually heavy discharge to the ground wire which had been placed near the Dallas Street substation. It is insisted Perkins was guilty of contributory negligence as a matter of law in proceeding to ground the wire in the manner he did after receiving such warning from Murrell.

As to the conversation in which this warning was given, Murrell testified:

"At about 8:30 on the morning when Perkins was killed, the witness had a conversation with Perkins. The witness had gone to Dallas Street substation, arriving there shortly after Jump had ordered line 101 opened and tagged to him. Blessing started to pull the ground chain over feeder 101, a precautionary measure taken in all cases where work is being done on high tension lines. After driving the ground pipe into the ground, he pulled the ground chain over the three wires of 101 with a rope provided for that purpose, and as the chain was pulled over the line, they observed an electrical discharge to the ground from the pipe at the surface of the ground. The wind was blowing and the discharge resembled a static discharge common on high power lines. However, it seemed a rather heavy discharge. The witness got in his car, drove to the power plant, went to the control board, and found Perkins there. He told Perkins of the heavy discharge to the ground which they had observed at the Dallas Street substation and asked him if there was a similar discharge apparent at the power house. Perkins said yes, that the lightning arresters to circuit 101 were discharging, but it was apparently due to static from the wind blowing, whereupon the witness told him that he did not believe the discharge was entirely static, and suggested that Perkins wait before doing any work on the power plant and on the line to allow the witness to send some man over the line from the power plant to the Dallas Street substation to inspect it and see if any other lines, which might be liable, were crossed with line 101. Perkins said this was unnecessary, as it would be impossible for another line to be crossed with 101 since they had so short a time before opened the oil switch and disconnects of 101, and, had 101 been crossed with another line, the other line would have burned down long before that. The witness then told Perkins that he did not like the looks of the discharge and requested a second time that he be allowed to patrol the line.

Perkins said, 'It is not necessary,' and asked if the witness had the line grounded at Dallas Street substation, to which the witness replied, 'Yes,' and Perkins then said: 'Well, you are protected and I am going to pull the ground chain on 101 line on the switch tower and I will be protected, so go ahead with your work. I am going to start.' The witness then left Perkins and some 30 minutes later was informed that Perkins had received a severe shock. The witness then sent Blessing to Dallas Street substation to tell the boys there to get in the clear until such time as they found what was wrong with the circuit. He then inspected the condition of the oil switch and disconnects at the power plant and found them both open."

It is evident Perkins regarded the discharge to the ground at the Dallas Street substation as static and the knowledge which he had justified him in so believing and in assuming that line 101 from switch No. 8 to the main power plant was de-energized and perfectly innocuous. It is evident, too, that the discharge to which Murrell testified was in fact due to static and Perkins' belief that it was such was correct. In the first place if it had been anything other than static, the men who went to work on 101 line between switch 8 and the substation would have been killed just as Perkins later was. It so happened they had gotten clear of the line before switch 8 was closed. Again, if it had been live current instead of static, it would not have drained off when Perkins bridged across his lightning arresters, but there would have been a continuous 13,000 volt arc which would have been unmistakable to experts like Perkins and Bowen.

Now, what was Perkins' real position? He had been advised from two different sources that switch 8 was open. Jump's message over the phone delivered through Roberts and Murrell's own message delivered in person. He knew, therefore, that it was a physical impossibility for current to come onto 101 from 103 if switch 8 was open, and that it was defendant's duty to keep it open. He was further told by Murrell that not only was switch 8 open, but also that the line was grounded. He had a right to assume that it had been properly grounded, and as an electrician he knew that, if this was a fact, no current could get to him even if somebody negligently shut switch 8, so he had assurance made doubly sure from that end of the line according to the representations which had been made to him. He had examined the control switch on the main board. With his own eyes he had seen that the oil switches were open and the manual disconnects out. He knew that the high lines were on top of 40-foot poles, over all other wires in the city, and that no other wire could fall across them. It would have been an idle waste of time to have patrolled the line. This would not have revealed anything, for the fact is that nothing was across it.

After his conversation with Murrell about static, he made physical tests of his line by bridging across the lightning arrester gaps with a disconnecting hook, and his tests conclusively demonstrated that the line was not then energized, for his first two tests drained the static and the third test produced no spark of any sort. He knew absolutely that the line was at that time dead. Bowen who was with him knew it too. This was after his conversation with Murrell. This is apparent because Murrell says he had been away from the plant for something like 30 minutes at the time Perkins was killed, and, further, Bowen and Butler both say Perkins went directly from his tests to put the chain across the line, and he was killed at approximately 8:15 a. m. Why should Perkins suspect that the line would be alive with 13,000 volts a few moments later because of a closed switch 8, and defective grounding at Dallas street, especially in view of the fact that he knew the line had been tagged to him and Jump and he had instructed Roberts not to let Jump energize the line until he (Perkins) had O. K.'d it? In the state of the evidence we regard the findings made in plaintiff's favor upon the issue of contributory negligence as well supported.

[3] It is also insisted that the causal connection between the negligent closing of switch No. 8 and the death of Perkins was broken by the act of the latter in attempting to make the "ground" in the manner he did and after the warning given by Murrell; that his action in so doing was an intervening independent act which broke the causal connection. With this we cannot agree. This phase of the evidence relates only to the issue of contributory negligence. There was no interruption in the causal connection between the negligent closing of the switch and Perkins' death.

[4] It is asserted the verdict and judgment for $30,000 is excessive. The deceased was a highly trained, skilled, and experienced electrical engineer, aged 32, in good health at the time of his death, and earned $260 per month, which he used for the support of his family. The amount of damages awarded is not excessive. Beaumont, S. L. & W. R. Co. v. Sterling (Tex. Civ. App.) 260 S. W. 320; Houston & T. C. R. Co. v. Davenport, 102 Tex. 369, 117 S. W. 790; Hines v. Mills (Tex. Civ. App.) 218 S. W. 777; Texas & N. O. R. Co. v. Harrington (Tex. Civ. App.) 241 S. W. 250.

[5] The argument of counsel presents no error; nor does the action of the court in permitting counsel for plaintiffs, in examining the jurors upon their voir dire, to ask whether they carried compensation insurance. The jurors all answered they did not, and, if it were conceded the examination was improper, we fail to see how it could have prejudiced the rights of appellant in any way.

Affirmed.