**RIO GRANDE, E. P. & S. F. R. CO. et al.**
**v. DUPREE et al.**

No. 2409.

Court of Civil Appeals of Texas. El Paso.

Feb. 5, 1931.

Rehearing Denied Feb. 26, 1931.

Turney, Burges, Culwell & Pollard, of El Paso, for appellants.

R. L. Holliday and Henry T. Moore, both of El Paso, for appellees.

HIGGINS, J.

On March 24, 1928, Dr. W. A. Dupree was killed in a collision between a Ford truck in which he was riding and a freight train operated by the Atchison, Topeka & Santa Fé Railway Company on the track of the Rio Grande, El Paso & Santa Fé Railroad Company.

This suit is by the appellee, Mrs. Dora Dupree, surviving wife of the deceased, suing in her own behalf and as next friend for her two minor sons, against the companies above named, to recover damages for the alleged negligent killing of her said husband. The

collision occurred in El Paso county at a public crossing known as the Tendick Crossing.

The case was submitted upon the general issue resulting in verdict and judgment in favor of plaintiff for $50,000. Upon the motion for new trial a remittitur of $14,000 was required by the court and entered by the plaintiff and judgment finally rendered for $36,000 against both defendants, apportioned $24,000 to the widow, $5,000 to one child, and $7,000 to the other.

As against the defendants the only issue of negligence submitted was the failure to give the statutory signals in approaching the crossing. Upon this issue the evidence was conflicting and by the verdict resolved in the plaintiffs' favor. As to the conclusive effect of that finding, no point is here made.

At the time of the collision Dr. Dupree and his son John were riding in the truck. Dr. Dupree was killed instantly and his son so crushed and mangled he died in a few minutes after the collision. The evidence does not disclose which of the two was at the wheel of the car when the collision occurred.

The issue of contributory negligence on the part of the driver of the truck or Dr. Dupree, in failing to keep a proper lookout for the approaching train, was submitted.

It is asserted that under the evidence contributory negligence, as a matter of law, is shown, and verdict in the defendants' favor should have been peremptorily instructed.

The evidence upon this issue is undisputed except perhaps in some minor and noncontrolling features.

At the place of the collision the track is straight for quite a distance. The paved state highway leading from El Paso to Las Cruces, N. M., runs parallel with the track and adjacent to the railroad right of way. This is a heavily traveled highway. Dr. Dupree's home is a short distance from the highway and across the railroad. He and his son were thoroughly familiar with the Tendick Crossing, having used it daily for some months prior to the accident. At the time in question the truck came along the highway traveling in the direction of Las Cruces. The train consisting of an engine and twelve freight cars was traveling in the opposite direction. When the crossing was reached the truck turned to the left and proceeded to the track in the direction of the Dupree home when the front left fender and wheel struck the locomotive. The point of impact was back of the cylinder head of the locomotive about 10 feet from the pilot. According to the testimony of the witness Bryant, fireman upon the engine, the man riding upon the right side of the truck grabbed the steering wheel just before the collision. This evidently swerved the truck to the right in an effort to avoid the collision and caused the impact to occur at the front left fender and wheel of the truck instead of the truck running head-on into the side of the locomotive. The train was traveling thirty-five or forty miles an hour. The truck was traveling ten or twelve miles an hour on the highway as it approached the crossing. There is a double row of telegraph and telephone poles between the railroad track and the highway, one row being on the railroad right of way, the other on the highway between the pavement and railroad right of way. Between the pavement and the railroad right of way is a salt cedar or tamarack bush about 12 feet high and 14 or 15 feet in width. This bush is about 460 feet from the crossing and upon the side of the crossing from which the train came. At the time a severe windstorm was blowing and the atmosphere impregnated thereby with dust and sand. It is 69 feet from the pavement to the railroad track, and at that point the track is about 2 or 2½ feet higher than the highway.

Excerpts from the testimony of various witnesses follows:

Sheppard, brakeman on the train, testified:

"Prior to that accident, I was riding on the engine on the brakeman's seat, directly in front of the fireman. That is on the left-hand side of the engine. * * * There is a highway running along beside the railroad, the highway was on my side of the engine. I had a view of the highway. That highway is very much in use. I saw the truck prior to the collision, that we were in collision with afterwards, but I didn't pay much attention to it until just about the time when it hit the train. When I first saw the truck, it was pretty close to the crossing, I couldn't say how close. It was on the highway, coming straight up the highway. There was nothing about it to indicate he intended to turn there. I did not know he was going to turn there. * * * He was continuously in my sight up to near the time of the collision. I noticed him turn off, just a few seconds before the collision. He did not stop. I couldn't tell whether he looked around to see whether a train was coming or not, I couldn't see through the windshield, I couldn't tell just who was in the car. It didn't seem to me he slowed down, it didn't seem that the speed of the automobile perceptibly decreased. I didn't do nothing until they hit, and I hollered at the engineer we hit a car on the side of the train. Probably ten seconds intervened between the time I saw him turn off and the time the collision occurred, something like that, I don't know, a very short time. I didn't have time to do nothing from the time I saw he wasn't going to stop until the collision. The automobile hit the engine. It hit the engine right on the front drivers, back about ten feet from the pilot, back of the cylinder

head. From the time I saw him turn off and saw he wasn't going to stop, there wasn't anything I could have done to prevent that accident."

Bryant, the fireman, testified:

"I saw the truck prior to the accident, I saw it about the time it left the paved highway there. I formed an estimate that the truck was going about ten or twelve miles per hour. He did not stop before undertaking to cross the tracks. As to what those in the automobile did, as far as I could see, from the time they left the highway until the accident,—well, the only thing that I saw them do was the man riding on the right side, it seemed he grabbed for the steering wheel just before the accident happened. Just before they ran into the side of the engine, it seemed to me that the man on the right side of the truck grabbed the steering wheel of the truck. The man that was riding on the left-hand side of the truck was the man behind the steering wheel, and the man on the right side, it seemed to me, tried to grab the steering wheel just before the accident. The time that intervened between the time I saw them leave the highway until the collision happened, was just a matter of a few seconds. * * * The car struck the engine just back of the left cylinder. That is about ten or twelve feet from the cowcatcher. I believe that was a Ford truck they were driving. I believe it had a top or cab around the front part."

The witness Phillips testified:

"I recall the incident of the death of Dr. Dupree on March 24th, 1928. I saw the train prior to this accident. Just prior to this accident, I was just above the crossing, driving a truck for the Gulf·Refining Company. I was coming to El Paso. * * * The day was an unusually windy day, and it was blowing sand at that crossing, I mean where the accident happened. There was a field just fresh plowed, I·believe, just on the opposite side of the railroad track, and the wind was blowing hard, and right there at that crossing the sand was coming pretty bad. I don't think there was enough sand being blown at times to interfere with or obstruct a person's view entirely on the highway. If a car was coming against that wind, as the sand was blowing, it would have a whole lot to do with one's view and it would interfere with or obstruct it to a certain extent. A person coming against it, and not going with it as I was, would have considerably more difficulty in seeing ahead of him than one going in the direction I was. As the gusts of wind or gusts of sand would blow across the highway from time to time, I would think in one way there would be enough wind and sand to obstruct one's view coming from El Paso, and that would be in getting their eyes full of the sand, but as far as obstructing the view, why, I wouldn't think so, more than in that way.

If I kept looking into the wind and sand blowing in it, it would get to the point it would considerably obstruct my view, it would fill my eyes full of dirt. I didn't hear the train as it came by me, I couldn't hear it as it rolled along by. I saw the truck prior to the accident, when I first saw it, it was coming-going up the highway. It was not but a short distance before it turned that I first observed it. I saw it turn. It would be hard to say how far the train was from the crossing when it turned in there at this crossing. At the time it left the pavement, why, the train wasn't—couldn't have been far up the track, and just what distance, I wouldn't know just what to say, but it couldn't have been far. I don't remember whether I testified on the other trial that the train was about. half way between the whistling post and the crossing when the truck turned in. That is somewhere near about the fact. It could have probably been something like half way, I think I stated before that it was something like half way. It could have been a little further off or closer. My observation is that at the time the truck turned off the paved highway to that crossing, that the train was near about half way between the crossing and the whistling post. When the truck turned in, I wasn't giving it no thought, I was coming on down the highway, but when it got to where I thought it ought to stop, why, I began stopping, and I did stop. I was·just above the salt cedar at that time. From where I was, it would be hard to say just how far the truck was from the track when I saw there was going to be a collision, but probably it was ten or fifteen feet, but from where I was I couldn't tell. It could have been a little further and it could have been closer. * * *

"There was nothing to indicate to me, when I saw that truck on the highway, that he was going to turn off to that crossing. I never thought about it. When the car made the turn to cross, he didn't stop. I judge the truck was going anywhere from ten to fifteen miles an hour. As far as I could tell, he didn't slow down any more than you would slow down at any crossing. He didn't bring his truck to any perceptible stop·after he turned, that I could tell. I formed the opinion in my mind that he wasn't going to stop, that is what I thought, and I stopped. It is hard to say just why I stopped, I got excited. I saw there was going to be·a collision and I intuitively put my feet on my own brakes, I thought it was time he was stopping. I wondered why he didn't stop, and he didn't do it. It is a fact that that truck ran into the side of the train. The train didn't strike the automobile at all, the automobile struck the train. * * * I couldn't tell whether it was the young man or the old man that was at the wheel. So far as I could tell, they made no effort to stop before they undertook to

cross the track, and made no effort, so far as I could tell, to ascertain whether a train was coming. Trains go along there every day. * * * I could not tell whether the Duprees were looking for a train or what they were doing, taking into consideration the distance I was from them. I didn't mean to tell the the jury what they were doing."

The witness Carter, county surveyor, testified:

"I am familiar with the concrete highway from El Paso up towards Cruces and I show that on the map before me. I also show the Santa Fé tracks. I did have the difference once between the track level and the highway level, I think it is between two and two and a half feet. As to the condition of this crossing, and the character of the crossing and material of this crossing, at the time I made this map—well, these two lines represent the concrete pavement, and the crossing was a gravel crossing, made from gravel from the hills. There was a board crossing across the railroad at the time. I don't say what it was, but I am satisfied it represents a board crossing. I am not sure whether it was board at that time or not. As I remember, it was a right narrow crossing, as it actually crossed the tracks (Scaling map). About 15 feet. It would be narrow for two cars to pass at the same time. The way you would go across the crossing, there was a depression in here and here (referring to each side). On the left-hand side as you go across, that is, toward El Paso, I believe the depression would run from about a foot up to probably three feet; and on the right-hand side I believe it is about the same, I am not very sure about that. I don't remember where, at the time I did this work, it was considerably more on the right-hand side, going over. My map shows the pole lines along the right-of-way of the highway and also of the Santa Fé. There is a pole here, a pole there, there is a pole here, a pole here, a pole here, a pole here, and then a few poles on up a little further. It is a fact that there are two lines of poles along the right-of-way of the Santa Fé tracks, all the way up and down the valley, one within the right-of-way and the other on the State highway. Each of these poles has one or more cross bars and each has wires. At the time I made that sketch, there was a salt cedar tree there. At that time it was between ten and fifteen feet high, twelve feet I think would probably hit it, and about fourteen or fifteen feet in width. At the time I made this sketch, there were also other bushes there, other than that salt cedar. There was a couple of tornillo bushes, I believe they were tornillo bushes, located about half way between the salt cedar and the crossing. They weren't together, they were probably thirty, forty, or fifty feet apart. I show them on the sketch, about thirty feet apart. In height they were quite a ways over a man's head, I would say they were ten or twelve feet high. * * * At the time I made this survey, I did not make a very close observation to see whether or not this salt cedar I referred to and these tornillo bushes and these poles would obstruct a train from above the whistling post from the view of a person approaching this crossing about where you would naturally turn off, but I have done it since. Those things I show there are obstructions to the view of a person in a car, approaching that crossing, that would obstruct the view of a train coming down toward El Paso. * * * In other words, it is 460 feet above the crossing, where these people would turn, up to where that tree is. That tree would be an obstruction to one going toward Las Cruces in an automobile, so they couldn't see a train on the railroad track, anywhere from this point, from in here (pointing). I stood right in here and watched a train come down, and anywhere from there on down to here, from that tree on back this way, your view is obstructed, it is impossible to recognize a train coming down between those. As to whether I mean to tell this jury that there is any place along that highway that one in an automobile, and looking that direction, can't see a train of twelve cars and an engine,— I will say I mean to say that a person coming along anywhere in here, it is impossible for him to see and recognize a train coming down this track in this direction."

L. W. Tendick testified:

"I recall the incident when Dr. Dupree and his son were killed on March 24th, 1928. They were killed at my crossing, named for me. Trains pass up and down that track at various times a day, going both ways. The special train that Dr. Dupree was killed by was supposed to come between 3:30 and 4:00, that day it came in at 1:35. Ordinarily, trains run along there between three and four. They go from Cruces to El Paso and from El Paso to Cruces. * * * There is an obstruction, when one is coming from El Paso going to my house, the way a person would ordinarily drive, that would obstruct or partially obstruct a person's view, riding in a car, of a train approaching that crossing. There is a cedar tree that obstructs it when you come off the main highway, about forty or fifty feet before you start in, until you get about even with the railroad, before you can see the locomotive at the whistling post. There is also a double line of poles there, that obstructs it to a certain extent. * * * It was windy the day of the accident, very windy. At times it would blow dust so you couldn't see ten feet before you, and stop and start again. There was a high wind and the ground plowed, and it picked up small gravel."

J. O. Clark testified:

"There certainly was wind ·blowing that day. Before the accident I had made a call—well, in from the Borderland Inn towards the river, to service a truck that broke down, and the sand was blowing so bad I couldn't hardly see to travel myself. I didn't know what rate the wind was blowing, but I know it was blowing hard enough it was pretty hard to control an automobile on the road at any speed at all. In the first place, you couldn't hardly see where you were going, the sand was so bad. I took the truck back with me."

Geo. E. Wood testified:

"I was born and raised in that country and knew just how it happened, the way the wind was blowing, it was one of those windy days in March, it was awful. On account of the country being leveled, any place between here and Canutillo is is pretty dusty, in February and March especially, when the wind is blowing. It was an awfully windy day. I know where that salt cedar bush was just before you got to this crossing. At the time of this accident, besides the salt cedar, there were two lines of telephone poles, one inside of the right-of-way and one on the highway, and they had crossbars. There were also other bushes there at the date of this accident. I know where Dr. Dupree's house is. A person going north from here and going across that crossing, those poles and that brush that was there, those cedar trees, made a regular curtain there, you couldn't see a train coming down there, because that train comes off a hill down. into that low place where that crossing is, and on account of those poles and that brush there you couldn't see a train, and the way the wind was blowing that day."

Howard Henson testified:

"As to the character of the weather the day of this accident,—well, that morning the wind started about ten o'clock, as it usually does in March, and it gradually increased all morning, and by the time I got down there it was nothing short of a gale. I mean from the time I came from Las Cruces down there. There was much sand blowing, especially along there on account of the plowed ground, the cotton fields. I mean the plowed ground on the right of the railway tracks, coming down. There was enough wind and sand blowing to obstruct a person's view on the highway."

Judson E. Doss testified:

"The wind was blowing very hard that day and sand was blowing."

R. C. Thomas testified:

"As to the character of the day of March 24th, 1928,—well, working there on the farm, we were putting up a chicken house and had been at work there laying hollow tile, and we almost had to stop work, it was so windy. Most of the country was plowed up at that time and this wind was sweeping the dust, the field west of my place was plowed up, and it was so dusty we could hardly work."

With reference to the character and condition of the Tendick Crossing, Mrs. Dupree and the witness Carter were permitted to testify over objection of appellants as follows:

Mrs. Dupree testified:

"At the time it was a narrow crossing with a ditch on either side. It was a crossing that just gave good leeway for one car and the ditches were deep, three, four, or five feet, I don't know, something like that, quite deep, on either side; and at that time the rails stuck above the planks there. It was a narrow one-car crossing. The dumps were ditched on the side. The road came up this way over the tracks on a rise and on either side there were falls down to the level of the surrounding country. They went down there, four or five feet, something like that. You had to go up hill from the highway to the railroad crossing."

Carter testified:

"These two lines represent the concrete pavement and the crossing was a gravel crossing made from gravel from the hills. There was a board crossing across the railroad at the time. I don't say what it is, but I am satisfied it represents a board crossing. It was a right narrow crossing about fifteen feet. It would be narrow for two cars to pass at the same time. On the left hand side there was a depression. I believe it would run from about a foot up to probably three feet and it is about the same on the right hand side."

It is unnecessary for us to here review the cases cited by appellants wherein the injured parties in crossing cases were held to be guilty of negligence as a matter of law. Suffice it to say these were cases where the evidence conclusively showed that the injured parties exercised no care for their own safety, but recklessly or heedlessly went upon the tracks in the path of approaching trains or cars.

On the other hand, the general rule prevailing in this state in crossing cases is "that the failure of one about to go over a public railroad crossing to look and listen for an approaching train, does not, of itself constitute negligence as a matter of law," and ordinarily the question is one of fact for the jury. Trochta .v. Ry. Co. (Tex. Com. App.) 218 S. W. 1038.

There is no direct evidence in this case that the occupants of the truck failed to look or listen for the approaching train, nor does such conclusion necessarily follow in view of the evidence adduced.

It appears the car approached the track at a moderate rate of speed. It could have been

halted in a few feet. We attach but little, if any, importance to the telegraph and telephone poles as an obstruction to the view of the occupants of the car, but the testimony of various witnesses discloses that the tamarack bush was a serious obstruction and photographs in the record seem to be confirmatory thereof. It is true the bush ceased to be an obstruction the moment the locomotive passed the same, but at the rate the train was traveling it took but a few seconds for the locomotive to reach the crossing. The most important phase of the evidence upon the issue is the violent windstorm raging at the time which undoubtedly seriously obscured the vision and impaired the hearing of Dr. Dupree and his son. The air was filled with dust and dirt. Conditions attendant upon such storms are matters of common knowledge in this section of the state. Again, this train, while not a scheduled one, passed considerably earlier than usual.

The condition of the crossing as testified to by the plaintiff and Carter is also important as explaining the failure of the occupants of the car to see the approaching train. Kansas City, M. & O. Ry. Co. v. Perry (Tex. Com. App.) 6 S.W.(2d) 111; Chicago, R. I. & G. Ry. Co. v. Laro (Tex. Civ. App.) 273 S. W. 684, 689.

The matters to which we have referred bring this case within the general rule in this state that the issue of contributory negligence was one of fact for the jury and its findings should not be set aside by this court. See the cases above cited and Galveston, H. & S. A. Ry. Co. v. Duty (Tex. Com. App.) 277 S. W. 1057, Missouri, K. & T. Ry. Co. v. Merchant (Tex. Com. App.) 231 S. W. 327; Galveston, H. & S. A. Ry. Co. v. Leifeste (Tex. Civ. App.) 8 S.W.(2d) 764; Beaumont, S. L. & W. Ry. Co. v. Sterling (Tex. Civ. App.) 260 S. W. 320.

■ Complaint is made of the exclusion of evidence to show the interstate character of the train in question. Appellants sought to prove that the train was transporting cars and merchandise which originated beyond the limits of this state, and that the train crew so originated. Briefly stated, the point presented is that the interstate character of the train renders applicable, upon the issue of contributory negligence, the rule of decision announced by the Supreme Court of the United States in Baltimore & O. Ry. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645.

This point is ruled against appellants in Galveston, H. & S. A. Ry. Co. v. Wells (Tex. Civ. App.) 15 S.W.(2d) 46. Upon the authority of that case we overrule the point presented. See, also, Galveston, H. & S. A. Ry. Co. v. Leifeste (Tex. Civ. App.) 8 S.W.(2d) 764.

■ With reference to the objection of immateriality urged against the admissibility of the testimony above quoted of Mrs. Dupree and Carter, concerning the condition of the crossing, this testimony was relevant to the issue of contributory negligence and properly admitted. Kansas City, M. & O. Ry. Co. v. Perry and Chicago, R. I. & G. Ry. Co. v. Laro, above cited, and Gulf, C. & S. F. Ry. Co. v. Hector (Tex. Civ. App.) 283 S. W. 562. Appellee pleaded the facts shown by this testimony, and we regard it as clearly relevant to the issue of contributory negligence.

The complaint made of the court's charge upon contributory negligence is without merit. If, in fact, the main charge upon the issue was too restricted under the facts, the same is fully corrected by special charges Nos. 6 and 8 given at appellant's request. These special charges present the issue as favorably as could be expected by appellants.

By bill of exception it is shown that:

"While the Hon. Robert L. Holliday was making the closing argument to the jury in said cause, he stated in said argument to the jury practically as follows:

" 'Gentlemen of the Jury, the failure of this crew to blow the whistle and ring the bell has taken a life. Mrs. Dupree has lost her husband and her sons a father. It might have been you. It might have been me. Some of you gentlemen have sons. It might just as well have been your son. Remember that when you render your verdict, to do unto others as you would have them do unto you.'

"To which argument when so made defendants' counsel objected and excepted for the reason that said argument was an appeal to passion and prejudice, had no evidence to sustain it; that the measure of recovery as therein asked by plaintiff's counsel was not a proper measure of recovery, but rather an appeal to sympathy; that same was inflammatory and highly prejudicial to the defendants, whereupon the court stated to the jury:

" 'Gentlemen, I withdraw from your consideration that part of the argument of counsel in which he said 'Consider if you had boys and judge as you would be judged.' That is not the measure you judge by, but follow the charge as written.'

"Whereupon Mr. Holliday stated:

" 'I add my request if the Court considers the argument improper, and apologize to the jury.' "

■ The remarks of counsel perhaps exceeded the bounds of strict propriety, but we do not regard the same as reversible in view of the court's instruction to the jury at the time and Mr. Holliday's request. Galveston, H. & S. A. Ry. Co. v. Hill (Tex. Civ. App.) 202 S. W. 358; Schmidt v. Houston Electric Co. (Tex. Com. App.) 242 S. W. 1019; Galves-

ton, H. & S. A. Ry. Co. v. White (Tex. Civ. App.) 216 S. W. 265.

These assignments are also overruled which complain of the verdict and judgment as excessive. In view of the remittitur of $14,000, we regard the amount of the judgment as amply supported by the evidence. Beaumont, S. L. & W. Ry. Co. v. Sterling (Tex. Civ. App.) 260 S. W. 320; Galveston, H. & S. A. Ry. Co. v. Wells (Tex. Civ. App.) 15 S.W.(2d) 46; Hines v. Mills (Tex. Civ. App.) 218 S. W. 777; Texas & N. O. Ry. Co. v. Harrington (Tex. Civ. App.) 241 S. W. 250.

Affirmed.